RAINY LAKE RIVER BOOM CORP. v. RAINY RIVER LUMBER CO., Limited.

(Circuit Court of Appeals, Eighth Circuit. May 4, 1908.)

No. 2,708.

1. APPEAL AND ERROR—REVIEW—MATTERS REVIEWABLE WHEN DIRECTED VERDICT IS ASKED BY BOTH PARTIES.

Where both parties request a directed verdict, the defeated party is estopped to claim that any question of fact should have been submitted to the jury, and the only questions reviewable on a writ of error are (1) whether there was any substantial evidence to support the courts finding on the facts, and (2) whether there was any error in the application of the law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 4024.

Operation and effect of motions by both plaintiff and defendant for direction of verdict, see note to Love v. Scatcherd, 77 C. C. A. 8.]

2. LOGS AND LOGGING—BOOM COMPANIES—POWERS UNDER STATE STATUTE.

Laws Minn. 1889, p. 351, c. 221, § 2, relating to boom companies as amended by Laws Minn. 1905, p. 106, c. 89, which authorizes the organization of

such companies to take possession of and improve any streams for the purpose of aiding in the driving and handling of logs therein, and to take charge of and drive logs at the request of the owner and make a charge therefor which shall be a lien on the logs, cannot be construed to authorize such a company to extend its works beyond the center of Rainy Lake river and within the jurisdiction of the Dominion of Canada.

3. SAME—RIGHT TO LIEN FOR TOLL—OBSTRUCTION BY BOOM OF INTERNATIONAL WATERS.

Defendant, a boom corporation, organized under the laws of Minnesota, had its principal booms on the Minnesota side of the Rainy Lake river, but extended its sheer boom across to the Canadian shore for the purpose of turning all logs floated in the river into its boom. Plaintiff, a Canadian lumber company, cut logs on the Canadian side and placed them in the river, to be floated down to its mill, which was on the same side. The river was free from obstructions, and no artificial aid to the floatage of the logs was necessary; but they were caught by defendant's sheer, and directed into its boom, where it sorted them from the logs of its customers and then again turned them into the river below. There was no contract between the parties; but defendant claimed its established tolls for handling such logs, and held a quantity of the same, claiming a lien thereon under the statute. *Held*, that under the Webster-Ashburton treaty of 1842 between Great Britain and the United States, which made the Rainy Lake river a part of the international boundary and provided that it should be "free and open to the use of the citizens and subjects of both countries," defendant's booms, at least such part as extended within the jurisdiction of Canada, were unauthorized and unlawful obstructions of the river, and that plaintiff could not be subjected by means thereof, without its consent, to tolls for handling its logs, and was entitled to maintain replevin in a court of the United States for the logs so unlawfully held by defendant.

Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the District of Minnesota.

Charles Loring (Halvor Steenerson, on the brief), for plaintiff in error.

C. J. Rockwood (A. Y. Merrill, on the brief), for defendant in error.

Before SANBORN and ADAMS, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. This is an action of replevin, in common form, instituted by the defendant in error (hereinafter designated the Lumber Company), against the plaintiff in error (hereinafter designated the Boom Company) to recover the possession of 500,000 feet of pine saw logs, alleged to be of the value of $7,500.

The answer pleaded that the Boom Company was organized for the purpose of improving, driving, and handling logs in the stream known as the Rainy Lake river, and that for such purpose it had taken possession of a considerable part of said stream, upon which no other corporation organized for such purpose had made improvements or taken possession, in aid of driving or handling logs therein; that its power to do so was granted by the statute law of the state of Minnesota (Laws Minn. 1889, c. 221, § 2, as amended by Laws Minn. 1905, p. 106, c. 89); that it has established and charged reasonable and uniform toll for booming, sorting, rafting, handling, and driv-

ing logs on said stream through said works; that the rate it established and charged was 35 cents per thousand feet, board measure, for booming and sorting saw logs; and that between the 18th day of April, 1905, and the 8th day of October, 1906, the Lumber Company had turned into its boom and had driven and floated upon said river into its works 27,305,664 feet of saw logs, bearing a designated stamp at the end, and on the side certain marks; and that for such service it held the logs for tolls, costs, and expenses, amounting to the sum of $9,556.98, together with interest since the 8th day of October, 1906. The answer admits that the logs were of the value of $7,500.

The Lumber Company replied, tendering the general issue as to the new matter set up in the answer, and further alleged that said Rainy Lake river is the international boundary between the United States and Canada, a colony of Great Britain; that by treaty made in 1842, between the United States and Great Britain, said river was made a navigable stream and highway, open and free to the citizens and subjects of the United States and Great Britain; that the center of said stream is the northerly boundary of the state of Minnesota; and that said state had no jurisdiction or authority over the traffic and commerce upon said stream, and was without jurisdiction or authority of any kind beyond the center thereof. It alleged that the statute laws of Minnesota are of no effect, because one-half of the river is beyond the jurisdiction of the state, and are in conflict with the treaty above mentioned, etc. It then charges that the Boom Company had wrongfully and unlawfully constructed entirely across said river a boom, which was designed to and did stop all of the logs floating on said river, and has so maintained it, except as it from time to time opened the boom and permitted them to pass through, and that it had wrongfully and unlawfully maintained such boom entirely across said stream, to stop and detain all logs floating on the river. It further alleged that the logs in question had been cut from timber owned by the Lumber Company upon lands in the province of Ontario, Canada, that the mill owned by it is situated at the town of Rainy River in said province, and that it employed the International Boom Company, a corporation engaged in driving logs upon the river, to take charge of and drive its logs in the season of 1905 and 1906, and to deliver the same at its mills in the town of Rainy River, which it did, except as hindered and prevented by the boom constructed by the defendant company, which was erected some three or four miles above the town of Rainy River, where the Lumber Company's mill was located. The reply charged that, without the consent and against the will of the Lumber Company and of the International Boom Company, said Boom Company stopped and detained said logs described in the petition.

At the conclusion of the evidence, both parties requested of the court a directed verdict. The court granted the request on behalf of the Lumber Company and refused that of the Boom Company. The rule of law and procedure in this jurisdiction is well established that, where both parties ask the court to instruct a verdict, both affirm that there is no disputed question of fact to be submitted to the

jury, and that every disputed question of fact is concluded in favor of the prevailing party, and that the only questions open to review on writ of error are: Was there any substantial evidence to support the court's finding upon the facts? And was there any error in the application of the law? Beuttell v. Magone, 157 U. S. 154, 15 Sup. Ct. 566, 39 L. Ed. 654; U. S. v. Bishop, 125 Fed. 181, 182, 60 C. C. A. 123; Empire State Cattle Co. v. Atchison, T. & S. F. Ry. Co., 147 Fed. 459, 77 C. C. A. 601; Roth, Executrix, v. Mutual Reserve Life Ins. Co. (recently decided by this court) 162 Fed. 282.

So much of the said amendatory act of 1905 of Minnesota as is pertinent to this controversy, in substance, is as follows: It authorized the corporation formed for the improvement of any stream and driving or handling logs therein, which shall have taken possession of such stream or any considerable portion thereof, upon which no other corporation so organized has taken possession or made improvements, to improve such stream by clearing and straightening the channels thereof, closing sloughs, erecting sluiceways, booms of all kinds, sluicing and flooding dams, etc., or otherwise as may be necessary. "But such corporation shall in no case, in any manner, materially obstruct or impede steamboat navigation or driving or handling logs." The corporation is required to serve the public equally and reasonably, and for a reasonable compensation. "Every such corporation which shall so improve a stream and so keep in repair and operate its works so as to render driving logs thereon reasonably practicable and certain, may charge and collect reasonable and uniform tolls upon all logs driven, sluiced, or floated on the same, and may take possession of all logs put into such streams so as to impede the drive, when the owners thereof or their agents shall not have come upon the stream adequately provided with men, teams and tools, for breaking the rollways and driving such logs in season for making a thorough drive down such stream, without hindering the main drive, and shall also, at the request of the owner of any logs, put into said stream, take charge of and drive the same down and out of such stream, or down such stream so far as their improvement may extend, and charge and collect therefor of the owner or party controlling said logs reasonable charges and expenses for such services." The act gave to the corporation for such tolls a lien on the logs, and authorized it to seize a sufficient amount to pay the tolls and to make sale thereof upon giving ten days' notice. The act further provided:

"That any corporation formed for the improvement of a stream which is in whole or in part, a boundary between them and an adjoining state or country and authorized to drive logs or maintain booms or dams in such stream, shall have authority to purchase and hold stock in corporations in such adjoining state or country created for similar purposes upon the same stream or to consolidate or unite with such corporation in such adjoining state or country whenever the purpose for which the corporation in this state is organized can be better effected thereby. * * * Provided that all dams and other works erected under the authority given by this act shall be so constructed, used and operated as to facilitate and expedite the driving and handling of logs upon the stream upon which the same may be erected, and the corporation making such improvements hereunder shall have no right to stop logs destined to points below its works on said stream, except where dams have been constructed to accumulate water for sluicing logs and

flushing the river below the same, and in such case, shall not detain logs in any part of the river so as to form a jam or to prevent the prompt delivery of logs destined for points below the works under authority of this act."

It is observable that there are some positive provisions, in the nature of limitations, imposed by this statute. While it empowered the Boom Company to take possession of a stream of water, it must be for the purpose of aiding and driving or handling logs thereon, "but such corporation shall in no case, in any manner, materially obstruct or impede steamboat navigation or driving or handling logs;" and, second, it may take possession of said logs put into such stream, if they so impede the drive when the owners shall not come upon the stream adequately provided with men, teams, and tools, etc., for breaking the rollways and driving such logs in season for making a thorough drive down such stream without hindering the main drive, and it may, on request of the owner of the logs, take charge of the same and drive them down and out of the stream, or as far as its improvements go, and make charges therefor. There is no allegation in the answer that the Lumber Company's logs were so put into said river as to impede the drive, or that it came upon the stream with its logs, without adequate men and equipments for handling and driving the same. Nor is there any allegation in the answer that the Boom Company took charge of said logs at the instance and request of the owner. On the contrary, the plea accords with the Boom Company's conduct. It proceeded upon the assumption that, by reason of its incorporation, it was authorized to so construct its boom, with sheers extending across the stream, as to draw into the housing yards or sorting pens of the boom, every log floating on the stream, and subject the owner, nolens volens, to handling fees of the company and the inspection fees of the state surveyor.

This is precisely what the Boom Company did. It constructed from its boom what is termed "sheers," which extended entirely across the river to the Canadian side, with only a small space left in the obstruction through which rafts, when manned, might be piloted, and with an opening or draw through which small boats might pass. Its general manager, Mr. Kennedy, testified that the sheer, so extending across the stream, was purposely so constructed as to compel all logs floating in any part of the stream to go inside of the boom. The right of the Boom Company to thus treat the logs of the Lumber Company floating on said river must be viewed in the relation sustained to this highway of commerce by the respective citizens of the United States and of Canada. Under what is known as the "Webster-Ashburton Treaty" of 1842 between the United States and Great Britain, this Rainy Lake river, throughout its extent, was recognized as a dividing line between the United States and the Dominion of Canada. The treaty declared that:

"All the water communications and all the usual portages along the line from Lake Superior to the Lake of the Woods, and also Grand Portage, from the shore of Lake Superior, to the Pigeon river, as now actually used, shall be free and open to the use of the citizens and subjects of both countries."

This treaty, having been made under the authority of the United States, became "the supreme law of the land, anything in the Constitution or laws of any state to the contrary notwithstanding." Article 6, Const. U. S. The right to the free and open use of this river by a citizen of Canada is not referable to any local regulation of a state of the United States that chances to be erected contiguous to the river, but it is established by said treaty. Said river is about 80 miles in length, extending from Rainy Lake to the Lake of the Woods. To a point within about 3 miles from its source to its outlet it is navigable in its natural condition, not only for floating logs, but for steamboats of considerable size. At the point where the boom in question is located, and for many miles above and below, it is smooth, deep water from bank to bank, from one-quarter to one-half mile in width. It required, for the purpose of navigation and floating logs, the construction of no artificial dams or sluiceways, or removal of any natural obstructions. Without the interference of obstructions erected by the hand of man, the logs of the Lumber Company cast upon the stream would flow on throughout its extent. The logs in question came from the Dominion of Canada. Their initial point of transportation was from the Canadian shore, and they were destined to the mill of the Lumber Company situated on the Canadian side of the river, several miles below the defendant's boom works.

As applied to this river, it is perhaps not too much to say that the term "state and interstate commerce" has no exact relation. While logs were driven from points on the Minnesota side to other points on the same side, and some were destined beyond the limits of the state, and this was true of shipments on the Canadian side of the river, the commerce partook of the character of foreign commerce, because citizens of the United States and their property necessarily come in contact with citizens and subjects of Great Britain and their property on an international highway, declared by treaty between the two countries to be free and open to the use of the subjects and citizens of each. Therefore it might, on principle, be said that this commerce was not subject to the control or regulation of any one state. Lord v. S. S. Co., 102 U. S. 541, 26 L. Ed. 224. In any event, the jurisdiction of the state of Minnesota could not extend beyond the center channel of the river. As said by Chief Justice Marshall, in Rose v. Himely, 4 Cranch, 279, 2 L. Ed. 608:

"It is conceded that the legislation of every country is territorial; that beyond its own territory it can only affect its own subjects or citizens. It is not easy to conceive a power to execute a municipal law, or to enforce obedience to that law, without the circle in which that law operates."

The only ground upon which the power of the state of Minnesota to make regulations, to be exerted through such a corporation as this Boom Company, respecting the navigation of and floating logs on a waterway, is that it is within its territory. Mr. Justice Field in Huse v. Glover, 119 U. S. 543, 7 Sup. Ct. 313, 30 L. Ed. 487, where the Illinois river was concerned, wholly under the jurisdiction of the state of Illinois, said:

"The state is interested in the domestic as well as in the interstate and foreign commerce conducted on the Illinois river, and to increase its facilities, and thus augment its growth, it has full power. * * * If, in the opinion of the state, greater benefit would result to her commerce by the improvements made than by leaving the river in its natural state—and on that point the state must necessarily determine for itself—it may authorize them, although increased inconveniences and expense may thereby result to the business of individuals. The private inconvenience must yield to the public good. * * * How the highways of a state, whether on land or by water, shall be best improved for the public good, is a matter for state determination, subject, always, to the right of Congress to interpose in the cases mentioned."

It is noticeable that in the leading case of Osborne v. Knife Falls Boom Corp., 32 Minn. 412, 21 N. W. 704, 50 Am. Rep. 590, touching the power of the state Legislature to authorize a boom company to take and hold logs floated on streams for fees exacted, it is based entirely upon the state's jurisdiction over its internal, domestic affairs. Speaking of the conflicts likely to arise among the several users of a stream for floating logs, the court said:

"In this conflict, who is to determine how the right of floatage upon this common highway shall be enjoyed? Who is to fix upon the just and proper compromise of these conflicting interests? Obviously, the Legislature—that department of government which, in the exercise of lawmaking and a police power, prescribes the rules by which the use of public highways in general is regulated; and, save as controlled by paramount law (that is to say, in this instance, by our state Constitution or Enabling Act), the discretion of the Legislature in the premises is practically unlimited. It may enact laws prescribing the manner in which the common right of floatage shall be enjoyed. It may determine what means shall be adopted and by what agency it is to secure results which, in its judgment, are the best and fairest practical compromises of conflicting interests."

It may be conceded that under ordinances erecting states with a dividing waterway forming a boundary line, and likewise under treaties between nations respecting such boundary water courses, the provisions securing to the citizens and subjects of both states and countries the free use of the stream is understood to mean that it shall be exempt from taxation and duties imposed or exacted by either of the states or countries to the compact. Cardwell v. American Bridge Co., 113 U. S. 210–211, 5 Sup. Ct. 423, 28 L. Ed. 959; Willamett Iron Bridge Co. v. Hatch, 125 U. S. 9 et seq., 8 Sup. Ct. 811, 31 L. Ed. 629. And it may be further conceded, for the purposes of this case, that either party to this treaty might authorize the construction of booms or other artificial structures within the boundary of its jurisdiction, to aid in the floating of logs. But the state of Minnesota had no right to authorize this Boom Company (which we hold it did not do under the legislative act in question) to so extend its boom by sheers across the river, beyond the channel to the Canadian shore, within the jurisdiction of Canada, so as to obstruct the free and open use of the river for floating logs thereon by a citizen of Canada. J. S. Keator Lbr. Co. et al. v. St. Croix B. Corp., 72 Wis. 62, 38 N. W. 529, 7 Am. St. Rep. 837.

The language of the treaty in question is not only that this water communication shall be free to the use, but also open to the subjects and citizens of both countries; that is to say, it shall not be

closed or otherwise so obstructed by either country as to prevent its free and equal use. While it is to be conceded that where the private citizen alone complains of such obstruction, by asserting detriment to his private interests in consequence thereof, he may not get relief in a private suit, as the state alone may complain of such encroachment upon its jurisdiction (Keator Lbr. Co. et al. v. St. Croix B. Corp., supra, and cases cited), this, however, can have no application to the case at bar, where this corporation, a citizen of the state of Minnesota, has wrongfully seized and withholds the private property of a citizen of Canada, when it comes and appeals to the courts of this country for the recovery of its property. Indeed, it would be a reproach to the nation, which in the opening preamble to its Constitution has declared it to be among the chief objects of the Union to "establish justice" (through the creation of courts for its administration), to hold that, when the foreign citizen's private property is wrongfully seized and withheld by a citizen of and within this country, our courts are not open for redress. It would be a poor consolation to the plaintiff to call upon its sovereign to complain to this government of an obstruction, in violation of the treaty obligation, which might only result in the removal of the obstruction.

Reliance for this extraordinary assumption of jurisdiction over the complainant's property, floating on the current of Rainy river, is upon the ruling in Lindsay & Phelps v. Mullen, 176 U. S. 126, 20 Sup. Ct. 325, 44 L. Ed. 400, where it was held that a boom company, organized under the Minnesota statute of 1889, which had erected on the Minnesota side of the Mississippi river a boom for the improvement of navigation and to facilitate the floating of logs and lumber thereon, was entitled to exact fees for handling logs taken within the inclosure of its boom, for the purpose of separating the logs which it was authorized to care for from other logs. The case dealt with a boom erected on the Mississippi river running between the states of Minnesota and Wisconsin. The defendant contested the lien, on the ground that the Mississippi river was a navigable stream, a national highway of commerce, and therefore any legislative act of the state affecting the regulation of navigation itself or the subject of such commerce was not permissible. The distinguishing feature of the discussion by Mr. Justice Brewer in that case lies within the following paragraph:

"The principal works of the boom company are wholly within the state of Minnesota. The center of the main channel of the Mississippi river is northeast of the island. The state of Minnesota had therefore the undoubted right to improve this portion of the Mississippi river lying southwest of the island for the purpose of facilitating the navigation of logs. It could do the work itself, or could authorize a corporation to do the work, and it could prescribe any reasonable fees for the use of the improvement. The power of the state to authorize the construction of these works did not depend at all upon the question whence all or most of the logs likely to be run into the boom should come. It is enough that the state authorized this improvement and prescribed the conditions upon which it might be used by any owner of logs. These conditions are not shown to be unreasonable. It is a legitimate exercise of power on the part of a state to provide state supervision of what is done in works of such a character and to require payment of reasonable charges for such supervision. It does not appear that the plaintiff was com-

pelled to avail itself of this boom, or that its logs were forcibly seized by the boom company and against its will passed through the boom. On the contrary, it would seem not improbable from the testimony that the persons who organized and owned the boom company were engaged in the business of cutting logs on the Chippewa river, and that this litigation sprang from their desire to get all the benefits of the boom without submission to the inspection laws of the state, which gave authority for the works. At any rate, if this plaintiff wanted to take advantage of the conveniences furnished by the boom, it is not in a position to avoid compliance with these provisions of the statutes of the state which authorized the construction of the works. * * * Indeed, its complaint is not that the sheer boom interfered with its rights of navigation in any way, but that after its logs had been passed into the works constructed under the authority and within the limits of the state of Minnesota it was not permitted to avail itself of the advantage furnished thereby and repudiate the charges prescribed by the state."

That was a waterway wholly within the jurisdiction of the United States, and constituted the dividing line between the two states. In such instance, under the common law respecting waterways, the channel of the river, designated "the Thalweg," is the dividing line of the respective state jurisdictions for certain purposes; and either state might, through the agency of an organized corporation, make needful regulations, within the confines of its jurisdiction, for rendering the stream serviceable for the purpose of navigation, such as the floating of logs in promotion of such industrial, commercial pursuit. So it was held that persons enjoying the benefit of improvements for facilitating such transportation might be subjected to contribution for the enjoyment thereof. While, in that case, the boom company had extended its sheer over near to the Wisconsin shore, the right of the boom company to exact fees and enforce the lien was justified, because the plaintiff there assented to and enjoyed the use of the boom, which the evidence showed was essential to the facilitation of such commerce.

The only case where the right of this Minnesota corporation to hold logs floated on Rainy Lake river for boomage charges is that of International Boom Co. v. Rainy Lake River Boom Corp., 97 Minn. 513, 107 N. W. 735. It did not present a controversy between a citizen of Canada and a citizen of Minnesota. So, when the plaintiff invoked the provisions of said treaty, the **court** met it with the assertion that:

"The evidence clearly shows that the plaintiffs acquiesced in defendant's possession of the river and the operation of its works, at no time questioning its right to do so, but utilizing the same in handling their logs."

And therefore it was not in position to raise the question. Further on the court said:

"If, then, the labor and services performed by defendant, and for which it claims a lien, were performed under a contract with plaintiffs, express or implied, the validity of the statute as applied to this particular stream of water is not involved. The question would be involved if defendant sought to enforce its asserted lien solely under the statute."

The court found, as a matter of fact, that the plaintiff used defendant's boom under contract, or, at least, there was sufficient evidence to entitle the defendant to take the verdict of the jury thereon. That

is not this case. It is true that defendant's counsel, in argument to this court, in the attempt to bring his case within the ruling of the Minnesota court, suggested that there was some such evidence in this case. Aside from the rule, hereinbefore announced, that where both parties requested a directed verdict the unsuccessful party affirmed "that there was no disputed question of fact which could operate to deflect or control the question of law," the incident relied on by the defendant to carry the case to the jury was so obviously insufficient as not to deserve consideration. On the contrary, the case presented by this record is where, without any request or invitation by the complainant, a citizen of Canada, the defendant Boom Company, a citizen of Minnesota, purposely so constructed its works, with its sheer extending across the entire surface of the stream over to the Canadian shore, as to compel the Lumber Company's logs floating on the river to pass inside of the housing of the boom, without even an allegation in its answer that it was necessary to aid the proper use of the river for such logging. In short, as this record advises us, this boom company had a contract with two or three other lumber companies for gathering in their logs, to be sacked and sent on to their mills, some situated on the Lake of the Woods. To accomplish and carry out its contracts, it constructed its barriers so as to float inside of its housing yards every log that came down the river; and for this work of separation it imposed a toll tax, in the form of fees, amounting to $9,556.96, on the plaintiff's logs rightfully floating on the river under said treaty stipulation.

Be it conceded that, in order to effect this separation of its patrons' logs from those of the plaintiff Lumber Company, the law indulged it in detaining the latter's logs a reasonably sufficient time therefor, yet it conferred no benefit whatever on the plaintiff company. Stress was laid by the Minnesota court in the International Boom Co. Case, supra, on the fact that, without the interposition of the boom company in gathering in the logs, they would go down the stream and into the Lake of the Woods, where, by reason of its size, they would be driven by wind in all directions and lost to the owner. In the case under review, this argument, ab inconvenienti, can have no force. The evidence is that when the Boom Company and its inspector, for the purpose of their fees, got through with the marking of the logs not belonging to its patrons, the defendant turned them afloat, unsacked and unattended, just as they were before they were brought into the defendant's network, to become, as far as the defendant cared or was concerned, a prey to the scattering winds of the Lake of the Woods. This boom company did not drive these logs within the meaning of the statute. It simply turned them loose at the lower end of its boom, to float on the current of the river as before it intercepted them. The evidence shows that the plaintiff Lumber Company, in order to gather its logs, when they reached the point of its mill on the Canadian shore, had the International Boom Company employed to gather and house them, for which it paid. We are unable, as applied to such situation, to perceive the force of the suggestion that as the plaintiff's logs were floated, mingling with the logs of other

owners, necessitating the gathering of the whole into the defendant's boom, in order to discover by the brand or mark what logs of its patrons might be in the mass, it was reasonable and equitable that the plaintiff should contribute to this expense. Mutatis mutandis, the defendant or its patrons should contribute to the expense incurred by the plaintiff in having its logs gathered into harbor for its mill. This suggests that each party should bear the burden, whatever it be, of gathering in their respective logs, on the rule that he who receives the benefit should bear the burden.

Be this as it may, on the broad proposition, asserted on the face of the answer, that any boom works established and maintained by the defendant which contributed to the gathering and separating of logs floating on the river, without any request for assistance by or any benefit conferred on the plaintiff, this defendant was entitled to a fee on every log it drew into the boom, it would result that, if it handled and housed only 100 logs of its patrons, with whom it had a contract, and uninvited gathered in 1,000 logs of the Lumber Company, it would recover ten times more fees from it than from its contracting patrons. To state such a proposition is to repudiate it. In our judgment, the amended statute of 1905 of Minnesota admits of no such construction, and affords no protection to the defendant's act in withholding from the plaintiff its property, under the facts and circumstances disclosed by this record.

It results that the judgment of the Circuit Court must be affirmed.

SANBORN, Circuit Judge (dissenting). In my opinion there is no essential difference between the facts in this case and the law applicable thereto and those in Lindsay & Phelps Company v. Mullen, 176 U. S. 126, 140, 144, 145, 148, 150, 152, 153, 20 Sup. Ct. 325, 44 L. Ed. 400. In that case the limit of the jurisdiction of the state of Minnesota was the thalweg of the Mississippi river. In this case it was the thalweg of the Rainy Lake river. In that case the Minnesota Boom Company constructed its main boom on the Minnesota side of the Mississippi river and extended its sheer boom to the Wisconsin shore, so that it turned all the logs coming down the river into the upper end of its main boom. In this case the Rainy Lake Boom Corporation constructed its boom under the same statute on the Minnesota side of the thalweg of the Rainy Lake river and extended its sheer boom to the Canadian side, so that it turned all loose logs coming down the river into the upper end of its boom. In that case there was no evidence that the Lindsay & Phelps Company either contracted or consented that their logs should be turned into the Minnesota Company's boom; nothing but that it did not appear "that the plaintiff was compelled to avail itself of this boom, or that its logs were forcibly seized by the boom company and against its will passed through the boom." Page 150, of 176 U. S., page 334 of 20 Sup. Ct. (44 L. Ed. 400). In this case the record discloses an essentially similar state of facts. In that case the Supreme Court held that a Wisconsin corporation, whose logs were on the way from Wisconsin to Iowa upon the Mississippi river and were turned into

the Minnesota Company's main boom by its sheer boom, must pay the charges of the surveyor general of Minnesota for inspecting and measuring them in that boom; and in this case the Rainy Lake Corporation boomed these logs and claims its lien under the same Minnesota law. Upon the authority of the argument in the opinion in that case, which it would be useless to repeat here, and of the decisions in that case, in Osborne v. Knife Falls Boom Corporation, 32 Minn. 412, 419, 21 N. W. 704, 50 Am. Rep. 590, in Pound v. Turck, 95 U. S. 459, 24 L. Ed. 525, in J. S. Keator Lumber Co. v. St. Croix Boom Corporation, 72 Wis. 62, 38 N. W. 529, 7 Am. St. Rep. 837, in Rundle v. Delaware & Raritan Canal Co., 14 How. 80, 93, 14 L. Ed. 335, in Willson v. Blackbird Creek Marsh Co., 2 Pet. 245, 7 L. Ed. 412, in Cooley v. Port Wardens, 12 How. 299, 315, 13 L. Ed. 996, and in the other cases cited in the opinion in the Lindsay & Phelps Company v. Mullen Case, it seems to me that the Boom Corporation has a lawful lien upon the logs in dispute which ought to be enforced.