## CLARK v. PIGEON RIVER IMPROVEMENT SLIDE & BOOM CO.

### No. 9138.

Circuit Court of Appeals, Eighth Circuit.

Aug. 27, 1931.

552

Edward L. Boyle, of Duluth, Minn. (Fryberger, Fulton & Boyle, of Duluth, Minn., on the brief), for appellant.

John D. Jenswold, of Duluth, Minn. (Jenswold, Jenswold & Dahle, of Duluth, Minn., on the brief), for appellee.

Before KENYON and BOOTH, Circuit Judges, and DEWEY, District Judge.

KENYON, Circuit Judge.

Appellant is a citizen of Canada. Appellee is a corporation exercising under the laws of Minnesota certain alleged rights on the Pigeon river, which is an international boundary line between the northeast corner of Minnesota and the province of Ontario.

Appellant is the owner of a large tract of timber on the Canadian side of the Pigeon river. Large amounts of timber are cut and piled on this land yearly, and the operation of producing pulpwood for the market has been carried on by him for many years. This pulpwood is floated down the Pigeon river to Pigeon Bay in Lake Superior and then towed or moved in boats to the mills at Port Arthur and Fort Williams, Ontario. Appellant is under contract to furnish to a Canadian corporation for a series of years large quantities of said pulpwood to be delivered each year during the month of May. Appellant hired a firm to conduct the driving of the wood. Appellee was organized as a boom corporation in 1898 under the General Statutes of Minnesota. It claims to have made improvements in the Pigeon river in aid of driving logs, and that it is authorized under state laws to obstruct the river and to collect a toll upon each cord of wood which floats down the river and to seize such wood as appellant's and hold it for the payment of the tolls. That appellee obstructed the stream by laying a boom across the main channel from the Minnesota shore to an island on the Canadian side and held back large quantities of appellant's pulpwood is without dispute. Appellant therefore was unable to carry out its contract of sale and will in the future be unable so to do if these obstructions remain in the river unless it pay to appellee the toll demanded. Whatever improvements appellee claims to have were constructed some thirty years ago. They have deteriorated and are of little, if any, value, and it is alleged in the complaint that they are a hindrance and not an aid to any one using the river for driving pulp-

wood. Any questions as to the years 1930 and 1931 are moot. The course of business during succeeding years is involved.

▮ The trial court dismissed upon motion the complaint for the reason that the same did not state that the Pigeon river was a navigable stream. For the purpose of the motion, therefore, the allegations of the complaint are taken as true.

The dispute involves the construction and application of certain parts of the Webster-Ashburton Treaty between the United States and Great Britain ratified August 22, 1842 (8 U. S. Stat. 572) which established the international boundary line between the United States and Canada. At the place involved (article 2) it provides the boundary line shall run: "Through the middle of the sound between Ile Royale and the northwestern main land, to the mouth of Pigeon river, and up the said river, to and through the north and south Fowl Lakes, to the lakes of the height of land between Lake Superior and the Lake of the Woods; thence, along the water communication to Lake Saisaginaga, and through that lake; thence, to and through Cypress Lake, Lac du Bois Blanc, Lac la Croix, Little Vermilion Lake, and Lake Namecan, and through the several smaller lakes, straits, or streams, connecting the lakes here mentioned, to that point in Lac la Pluie, or Rainy Lake, at the Chaudiere Falls, from which the commissioners traced the line to the most northwestern point of the Lake of the Woods." After describing the boundary it is further provided: "That all the water communications and all the usual portages along the line from Lake Superior to the Lake of the Woods, and also Grand Portage, from the shore of Lake Superior to the Pigeon river, as now actually used, shall be free and open to the use of the citizens and subjects of both countries."

It is the theory of appellant that he is entitled, as a citizen of Canada, to have this water communication, to wit, the Pigeon river, open and free to his use as well as the use of other citizens of Canada and the United States, and is entitled to drive his pulpwood down the Pigeon river without payment of tolls and without interference from appellee, regardless of any action of the Legislature of Minnesota, and that the attempt of the Legislature to give rights along the Pigeon river that would obstruct the use of the same by appellant in floating his pulpwood results in a violation of section 8, article 1, of the Constitution of the United States, which provides: "The Congress shall have Power

* * * to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."

These questions arise: (a) Is navigability of the Pigeon river an essential element of appellant's cause of action? (b) If so, is the complaint sufficient to cover said question? (c) Is the Pigeon river one of the water communications referred to in the Webster-Ashburton Treaty? (d) Does the floating of pulpwood thereon constitute the free and open use which the treaty provides?

▮ Assuming that under the terms of the treaty the water communications referred to must be navigable streams, what is the situation presented by the complaint? Navigability in law is dependent upon navigability in fact. The old doctrine of the common law that the ebb and flow of the tide establishes navigability has no application in this country. The decisions of the Supreme Court make clear the test of navigability. In Economy Light Co. v. United States, 256 U. S. 113, 41 S. Ct. 409, 412, 65 L. Ed. 847, it is laid down as follows: "Whether the river, in its natural state, is used, or capable of being used as a highway for commerce, over which trade and travel is or may be conducted in the customary modes of trade and travel on water. Navigability, in the sense of the law, is not destroyed because the water course is interrupted by occasional natural obstructions or portages; nor need the navigation be open at all seasons of the year, or at all stages of the water." State of Oklahoma v. Texas, 258 U. S. 574, 42 S. Ct. 406, 66 L. Ed. 771; The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999. It would serve no useful purpose to enter into any discussion of the numerous cases that have arisen in this country over the question of navigability. Here it is one to be determined by federal law and not by local standards. The Minnesota rule as to navigability seems to be that the floatage of logs and timber down a stream in substantial quantities at proper seasons therefor is sufficient to establish navigability. Minnesota Canal & Power Co. v. Koochiching Co., 97 Minn. 429, 107 N. W. 405, 5 L. R. A. (N. S.) 638, 7 Ann. Cas. 1182; Rainy Lake River Boom Corp. v. Rainy River Lumber Co. (C. C. A.) 162 F. 287. The same rule applies in many other states. In re Southern Wisconsin Power Co., 140 Wis. 245, 122 N. W. 801; Drainage District No. 3 v. Machias Mill Co., 104 Wash. 493, 177 P. 326; Logan v. Spaulding Logging Co., 100 Or. 731, 190 P. 349. Farnham on Waters and Water Rights, § 25, says: "But if the general character of the

stream is such that it will float logs without aid from the banks, the mere fact that persons using it find it convenient to go upon the banks, and, in fact, do so, will not destroy the navigable character of the stream." It appears that the Pigeon river was used for the kind of commerce natural to a timber country—the floating of logs and timber. As to whether there was sufficient of such floatage of logs to show the stream to be navigable under all the circumstances would have to be developed on the trial of the case. It may be noted that Congress through a series of years declared some twenty-seven streams in the United States not to be navigable. Pigeon river was not among them. Title 33, sections 21 to 47, USCA.

 If the question of navigability is controlling in appellant's claim, is the complaint sufficient to present it? It does not allege that the Pigeon river was navigable. It does allege that appellant's rights were based on that part of the Webster-Ashburton Treaty providing that the water communications be free and open to the use of the citizens and subjects of both countries, and that appellant has the right under such treaty to drive his pulpwood down the Pigeon river without the payment of tolls and without interference from appellee. Pleading that appellant's rights were based upon the treaty would we think entitle him to a judicial determination of whatever facts might be found by the court essential to its application. This is of course open to the suggestion that this is in the nature of pleading a conclusion of law, but that objection was not made. While the pleading is lacking in clearness, if it can be construed in any way to present the question of navigability, we think the case should not have been dismissed on that ground. The questions here are too important to be determined by technical matters of pleading.

What we have so far said would require a reversal of this case, but it seems proper, in view of another trial, to state our views as to other questions involved.

 Possibly our discussion of the sufficiency of the complaint is somewhat superfluous, in view of our opinion that appellant was not compelled, in order to secure injunctive relief, to plead or prove that Pigeon river was a navigable stream. The Webster-Ashburton Treaty was drawn by experts skilled in such affairs, who must be supposed to have known exactly what they were doing. If they were referring only to navigable water communications being kept free and open,

it would have been very easy to have so stated, but the treaty does not so state. Where it was considered important in the treaty to refer to navigable streams, that course was followed. Article 3 provided for the "navigation" of the St. John river between Maine and New Brunswick being free and open. In a letter to Mr. Webster dated July 11, 1842, found in Senate Documents, 3d Session, 27th Congress, vol. 1, pp. 51, 55, Lord Ashburton speaks of the floating of logs down this river as "this navigation." The references to the St. John river or the St. Lawrence river in the treaty are not the same as are those to the Pigeon river. We have referred to "navigation" being used as to the St. John river, and in article 7 the words "ships, vessels and boats" are used as to the St. Lawrence river. As to the Pigeon river it was not said that navigation should be free and open, but that "all water communications" shall be "free and open." In establishing the boundary of the St. John river the Thalweg theory of boundary is adopted, i. e., that the line is to run along "the middle of the main channel." They did not do this as to the Pigeon river, but used the term "up the river." If Daniel Webster and Lord Ashburton had intended to confine the clause in question here to navigable waters, they would have used such term. It is significant that they did not do so. Why should the court write into their language something they evidently intentionally omitted. It was presumably known to them in dealing with the subjects covered by the treaty that the traffic on the Pigeon river was merely a part of the land water trek, and that these waters were used to transfer by canoes and along portages supplies for the trapper and were outlets for the products of the trappers. Counsel for appellant quotes in his brief some extracts from writers on the subject of this early Minnesota history, which shows the general nature of the commerce which was being carried on along the Pigeon river. From Dr. Buck, Professor of History of the University of Minnesota, in his book, "Story of the Great Portage," as follows: "The Pigeon River, which now forms the international boundary at Lake Superior, was in the days of water transportation, the best natural highway between the Great Lakes or the St. Lawrence system and the great northwestern section of the continent, with its thousands of lakes and streams draining into Hudson Bay or the Arctic Ocean." Again, from Baker's Historical Collections: "Henry records that he met 40 canoes on the Pigeon River loaded with furs from Athebasca Lake and bound for Grand Portage."

The Canadian courts have had before them similar questions as to the right of the state of Minnesota to interfere with the free use of Pigeon river where it constitutes part of the international boundary, and it is interesting to note their attitude. In Rainy Lake River Boom Corporation v. Rainy River Lumber Co., 27 Ontario Law Reports, 131, the court said:

"The legislation of the State of Minnesota is the only legislative authority upon which the plaintiff company relies as authorizing it to impose tolls. Had the State Legislature power to grant such authority?

"Under the Ashburton Treaty, the citizens of the two countries became entitled to the free use of the river. The legislature of the State of Minnesota has purported to deprive them of that right by granting permission to the plaintiff company to exact tolls. The undisputed evidence is, that the State Legislature had no jurisdiction so to repeal that clause in the treaty.

"I, therefore, think that the provision in the plaintiff company's charter purporting to entitle it to impose tolls or other charges is ultra vires the State Legislature and null and void."

In Arrow River and Tributaries Slide and Boom Co., Ltd., 39 Ont. Weekly Notes 434, 66 Ontario Law Reports, 577, the Canadian Court said:

"The objection of the appellants is substantially that owing to the Ashburton Treaty of 1842, this River was to be 'free and open' for the nationals of the two contracting parties, Britain and the United States. * * *

"To put it simply, placing His Majesty in the position of an honorable man, who had agreed that another should have the right to pass over his land under the water, could it be even imagined that he would either himself build such structures as are in question here or authorize another to do so? To my mind, to ask this question is to answer it.

"I think that the Statute was not intended to and does not confer upon this Company the right to build upon the bed of the Pigeon River anything which may interfere with the enjoyment of free and open use of it by the citizens of the United States. That what the Arrow Company has done has such effect is perfectly obvious from the evidence."

"The appeal should be allowed with costs here and below, and the fixing of tolls for any part of the Pigeon River should be prohibited."

We are not advised as to the result of an appeal in this case to the Supreme Court of the Dominion at Ottawa. This court had before it the question of the construction of this provision of the Ashburton Treaty in Rainy Lake River Boom Corp. v. Rainy River Lumber Co., 162 F. 287, 293. The Rainy Lake Boom Corporation there involved was organized under the same Minnesota statute as appellee in the case at bar, and claimed the right to collect tolls on logs driven on the Rainy river. It had seized logs of the lumber company and held the same for tolls. The lumber company raised the same question as here that by the terms of the Webster-Ashburton Treaty the river was open and free to the citizens and subjects of the United States and Great Britain, that there was no authority in the state of Minnesota over the traffic and commerce thereon, and that the Minnesota statute conflicted with the treaty. The court discussed this article of the treaty we are considering and pointed out that the right to the free and open use of the river under the treaty by a citizen of Canada cannot be limited by local regulations of a state. Its view of the free use of a stream was exemption from duties imposed or exacted by either of the countries to the compact. Interesting is this language of the court: "But the state of Minnesota had no right to authorize this Boom Company (which we hold it did not do under the legislative act in question) to so extend its boom by sheers across the river, beyond the channel to the Canadian shore, within the jurisdiction of Canada, so as to obstruct the free and open use of the river for floating logs thereon by a citizen of Canada." The only difference apparent between the Rainy River Case and this case is that the Rainy river was concededly a navigable stream. In that case the boom company extended its operations across the river to the Canadian side. Here the boom was attached to an island on the Canadian side. That the construction of appellee's boom and the levying of tolls on floating timber amounted to an obstruction in the stream would of course not be disputed.

Was the floating of pulpwood down the Pigeon river within the free and open use provided by the treaty? At the time of the treaty there had been little development in the great northwest timber country. Whether that possible development was taken into consideration in the drawing of the treaty we do not of course know. Appellee's theory is that the words of the article, "as now actually used," limit water communications and the

556

usual portages to such traffic as they were used for at that time, i. e., as a fur trader's route, and have no reference to the floating of logs, and do not impair the power of the state of Minnesota to permit the collection of proper tolls and charges for benefits conferred upon the users of appellee's improvements. As a matter of grammatical construction, an argument might be made that the term "as now actually used" applies to all the water connections and early portages and not merely to Grand Portage, but it appears from the record that Grand Portage alone of all the portages is not "along the line," and we think therefore the words, "as now actually used," refer only to Grand Portage. Any other theory would give the treaty a narrow and apparently distorted construction. Good faith between nations requires carrying out treaty obligations according to the intentions of the contracting parties. The Canadian courts seem to have done this.

 Treaties are to be fairly and liberally construed to carry out the intention of the parties thereto at the time the treaty was written and adopted. Treaties, with the Constitution and the Laws of the United States, are the Supreme Law of the land. Article 6 of the Constitution. In Jordan v. Tashiro, 278 U. S. 123, 127, 49 S. Ct. 47, 48, 73 L. Ed. 214, the court said: "The principles which should control the diplomatic relations of nations, and the good faith of treaties as well, require that their obligations should be liberally construed so as to effect the apparent intention of the parties to secure equality and reciprocity between them. * * * Upon like ground, where a treaty fairly admits of two constructions, one restricting the rights that may be claimed under it and the other enlarging them, the more liberal construction is to be preferred." And in Nielsen, Administrator v. Johnson, Treasurer, 279 U. S. 47, 52, 49 S. Ct. 223, 73 L. Ed. 607, the court says: "As the treaty-making power is independent of and superior to the legislative power of the states, the meaning of treaty provisions so construed is not restricted by any necessity of avoiding possible conflict with state legislation and when so ascertained must prevail over inconsistent state enactments." The court in Sullivan et al. v. Kidd, 254 U. S. 433, 439, 41 S. Ct. 158, 160, 65 L. Ed. 344, said: "Writers of authority agree that treaties are to be interpreted upon the principles which govern the interpretation of contracts in writing between individuals, and are to be executed in the utmost good faith, with a view to making effective the purposes

of the high contracting parties; that all parts of a treaty are to receive a reasonable construction with a view to giving a fair operation to the whole." It certainly would not be a liberal interpretation of this treaty to hold that the parties intended only to preserve water communications and portages for fur traders operating in canoes. Such lack of any vision as to the future is inconceivable. We are not impressed with the argument that the Root-Bryce Treaty of 1909 (36 Stat. 2141) amounted to an abrogation of the Webster-Ashburton Treaty as to the article in question.

 The other question is that of obstruction to foreign commerce by a corporation organized under the law of the state of Minnesota. By article 1, § 8, of the Constitution, Congress is given plenary power to regulate commerce with foreign nations, and the states cannot interfere therewith. There is no limitation to such power except as may be prescribed in the Constitution. The government of the United States is the only authority authorized to regulate commerce with foreign nations. Buttfield v. Stranahan, 192 U. S. 470, 24 S. Ct. 349, 48 L. Ed. 525. States do not make treaties and cannot by legislative act interfere with the proper observation of treaties nor destroy rights created thereby. It may well be inquired where the state of Minnesota acquired any authority to burden commerce passing from one point in Canada down an international boundary to another point in Canada, and as is suggested in brief of counsel for appellant, if the Mounted Police of Canada should dynamite part of the boom tied to the island on the Canadian side what could the state of Minnesota do about it? The state of Minnesota was not a party to the treaty. What business had the boom on the Canadian side in any event without permission from the Canadian government, which does not appear as far as the motion is concerned. Neither party to the treaty authorized its construction. This court said in Rainy Lake River Boom Corp. v. Rainy River Lumber Co., 162 F. 287, 292: "The right to the free and open use of this river by a citizen of Canada is not referable to any local regulation of a state of the United States that chances to be erected contiguous to the river, but it is established by said treaty. * * * As applied to this river, it is perhaps not too much to say that the term 'state and interstate commerce' has no exact relation. While logs were driven from points on the Minnesota side to other points on the same side,

and some were destined beyond the limits of the state, and this was true of shipments on the Canadian side of the river, the commerce partook of the character of foreign commerce, because citizens of the United States and their property necessarily come in contact with citizens and subjects of Great Britain and their property on an international highway, declared by treaty between the two countries to be free and open to the use of the subjects and citizens of each." If appellant is entitled to use the Pigeon river by virtue of the treaty to float this pulpwood, an obstruction to such use is an interference with foreign commerce.

Other questions are presented which we deem unnecessary to consider, such as whether appellee received any authority at all under the Minnesota statute to assume management and control of logs of other parties floating on public highways, and whether appellee was aiding in the use of water communications or retarding the same. All of these important questions suggest that appellant is entitled to a trial on the merits of his claims.

 The remaining point urged by appellee is that appellant has a complete remedy at law—hence cannot maintain this suit in equity, and that the bill was therefore properly dismissed, even if this question was not raised. Section 267 of the Judicial Code (title 28, USCA § 384) provides that suits in equity shall not be sustained in United States courts where there is a plain, adequate, and complete remedy at law. That remedy, however, must be one that is adequate, speedy, plain, and complete, not an impracticable or theoretical remedy which does not reasonably and fairly meet the situation to accomplish the purposes of justice. Appellee contends that appellant can bring an action for damages every year, or, if the logs are held by appellee, it can bring an action of replevin. It suggests that, if judgment were recovered, "defendant would presumably conform its future action to such judgment." It is true that year after year an action for damages could be brought or replevin could be undertaken upon the appellant furnishing sufficient bonds for possession. Such relief would not be adequate to meet the situation presented. Appellant was under agreement to deliver its pulpwood in Pigeon Bay during May of each year. It does not seem to us that it can reasonably be contended that under the circumstances the remedy of injunction was not available to appellant. It is apparent that, if appellant had the right to float its pulp-

wood on the boundary stream in order to carry out contracts made for its delivery covering a series of years, and if appellee persisted in obstructing the same, continuous actions for damages or in replevin to secure his properties would not constitute adequate and sufficient legal remedy to protect his rights. We think the learned trial court should not have dismissed the complaint, and its judgment and decree must be reversed. It is so ordered.

Reversed and remanded.