JACKSON et al. v. CRAVENS et al.

(District Court, S. D. Florida. March 23, 1916.)

1. COURTS ⬦⟹508(1)—FEDERAL COURTS—SUIT TO ENJOIN ENFORCEMENT OF STATE STATUTE.

A federal court organized under Act March 4, 1914, c. 160, 37 Stat. 1013, for the purpose of hearing a suit for an injunction to restrain enforcement of a state statute as in violation of the Constitution of the United States, will not undertake, on an application for a preliminary injunction, to determine the validity of the statute under the state Constitution, or objections to its validity on other grounds not connected with the federal question, which alone gives the court jurisdiction.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1418; Dec. Dig. ⬦⟹508(1); Injunction, Cent. Dig. § 72.]

2. COMMERCE ⬦⟹50 — CONSTITUTIONAL LAW ⬦⟹240(1) — INSPECTION ⬦⟹2 — POWERS OF STATE TO MAKE REGULATIONS—CONSTITUTIONALITY OF STATUTE—INSPECTION OF NAVAL STORES.

Act Fla. June 5, 1915 (Laws 1915, c. 6878), which provides for the inspection of naval stores in accordance with a fixed standard by inspectors appointed by the state, for which fees are charged, and prohibiting the sale in the state or shipment out of the state of uninspected stores, except where, after demand, inspection has not been made within 20 days, is not an interference with interstate or foreign commerce, nor does it deny to owners or shippers the equal protection of the laws, but is within the police powers of the state, and valid.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 48–53; Dec. Dig. ⬦⟹50; Constitutional Law, Cent. Dig. §§ 688, 693, 697, 698; Dec. Dig. ⬦⟹240(1); Inspection, Cent. Dig. § 2; Dec. Dig. ⬦⟹2.]

In Equity. Suit by J. W. Jackson and others against E. S. Cravens, Supervising Inspector of Naval Stores, or purporting to be Supervising Inspector, and others. On. application for preliminary injunction. Denied.

---

⬦⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

C. M. Cooper, Chas. P. Cooper, and J. J. G. Cooper, all of Jacksonville, Fla., for complainants.

Thos. F. West, Atty. Gen., Watson & Pasco, of Pensacola, Fla., and John C. Cooper & Son, of Jacksonville, Fla., for defendants.

Before WALKER, Circuit Judge, and CALL and SPEER, District Judges.

SPEER, District Judge. The theory of this bill is that the legislation of the state of Florida assailed is not a legitimate exercise of the police power of the state, and is not a bona fide law for the inspection of naval stores; also, that it is an arbitrary discrimination between the producers who ship to points outside the state, or who shall sell directly to the consumer. It is insisted that it is the purpose of the statute to interfere with commerce between the state of Florida and other states of the United States and with foreign nations. All of this is alleged to be violative of the Constitution of the United States, as expressed, not only in the commerce clause, but also in the fourteenth amendment. It is also alleged that the system of inspection provided is inoperative, imperfect, burdensome, and costly, and that it is violative of the several clauses of the Constitution of Florida mentioned in the bill. An injunction is sought against the inspection and prosecuting officers of the state, including the Attorney General.

[1] In so far as the alleged imperfection and ineffectiveness of the measure may be involved, and particularly in so far as the inspection law of the state is declared to be violative of the Constitution of the state, this court has no proper concern, at this stage of the case. This is not a controversy between citizens of different states, but between citizens of Florida and other citizens of the same state. Our jurisdiction is based upon the question: Is this legislation violative of the relating provisions of the Constitution of the United States? It is a serious demand upon a court of the United States when it is required that it shall declare an act of a state Legislature unconstitutional. All legislation is presumed to be constitutional, and to hold it unconstitutional, the court must resolve every reasonable doubt in favor of constitutionality. Recent legislation of Congress has, indeed, thrown a stronger contravallation around state than exists around national legislation. One judge of a District Court of the United States, in a proper case, may hold an act of Congress invalid; but three judges must now constitute a court with jurisdiction to hold a state law invalid. One of these must be a Circuit Justice, or a Circuit Judge. See Act March 4, 1914, 37 Stat. at Large 1013. This court was organized under the provisions of this statute.

The general jurisdiction of the appropriate United States court to hold a state law or state action violative of the Constitution of the United States has long been settled. It was restated in a recent carefully considered case. Ex parte Young, 209 U. S. 149, 28 Sup. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, opinion by Mr. Justice Peckham. There the Attorney General of a state had disregarded the order of the Circuit Court of the United States, and after hearing was held in contempt. His application for habeas cor-

pus was denied, and the denial was affirmed by the Supreme Court. Said the learned Justice, delivering the opinion:

"The various authorities we have referred to furnish ample justification for the assertion that individuals, who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the federal Constitution, may be enjoined· by a federal court of equity from such action."

In Western Union Telegraph Co. v. P. R. Andrews, 216 U. S. 165–167, 30 Sup. Ct. 286, 54 L. Ed. 430, the doctrine was reasserted, and a number of prosecuting attorneys were enjoined from enforcing an act of a state in violation of the national Constitution. It will, however, be difficult to cite a case where, on an application for preliminary injunction, a court of the United States devoid of original jurisdiction, save for the federal question involved, will undertake to test the validity or effectiveness of state legislation, in the light of the state Constitution, or review in any way the discretion of the state Legislature as expressed in the enactment. Said Mr. Justice Brewer, ·for the Court, in Michigan Central R. R. Co. v. Powers, 201 U. S. 291, 26 Sup. Ct. 461, 50 L. Ed. 744:

"If conflict with the state Constitution is the sole ground of attack, the Supreme Court of the state has a final authority"—citing Merchants' Bank v. Penn., 167 U. S. 461, 17 Sup. Ct. 829, 42 L.' Ed. 236.

The learned justice continues:

"Undoubtedly a federal court has jurisdiction, and when the question is properly presented it may often become its duty to pass upon the alleged conflict between a statute and the state Constitution, even before the ·question has been considered by the state tribunals. All objections to the validity of the act, whether springing out of the state or of the federal Constitution, may be presented in a single suit and called for consideration and determination. At the same time federal courts will be reluctant to adjudge a state statute to be in conflict with the state Constitution before that question has been considered by the state tribunals."

In Coulter v. Louisville & Nashville R. R., 196 U. S. 609, 25 Sup. Ct. 344, 49 L. Ed. 615, it is stated by Mr. Justice Holmes, for the court:

"But the supposed infringement of the Fourteenth Amendment is the only ground on which the railroad company could come into the Circuit Court, and if that ground fails, and obviously fails, the court should be very cautious, at least, in interfering with the state's administration of its taxes upon other considerations which would not have given it jurisdiction."

In both of these cases it will be observed that interference with the state law was refused, the federal question being negatived.

A different conclusion may have been induced by a line of decisions beginning with Horner v. U. S., 143 U. S. 570, 12 Sup. Ct. 522, 36 L. Ed. 266, where the Supreme Court held:

"Where the constitutionality of an act of Congress was drawn in question, and an appeal lay directly to the Supreme Court from the Circuit Court, under paragraph 5 of the act of March 3, 1891, the Supreme Court acquired jurisdiction of the entire case, and of all questions involved in it, and not merely of the question of constitutionality."

That rule, however, defines the power of the Supreme Court, the court of final jurisdiction in equity. This being, as appears from the act of Congress approved March 4, 1914, supra, a court assembled for a specific duty, it would seem that, ordinarily, our jurisdiction is restricted to that duty. This view will relieve the court, at least on this preliminary application, from passing upon the multitude of averments in the bill as to the alleged ineffectiveness and injurious character of the legislation assailed, and the relating arguments in the elaborate brief for the plaintiffs.

[2] That the production of spirits of turpentine and rosin, commercially termed naval stores, is a vastly important enterprise of the state of Florida, may be gathered as well from the bill, the answer, and the affidavits. It may be gathered, also, that the animating, pecuniary consideration, which is the inspiration of this litigation, is the profit which may inure from handling this great product. Anterior to the enactment of this legislation, the product had been generally transported to ports of other states, principally to Savannah, in the state of Georgia. It now largely moves to Florida ports, and the warehousemen, factors, inspectors, and others handling it there are measurably advantaged. The profits of the Savannah interests may be in some degree diverted; but is this result, however regrettable, one in which the court can have proper concern? The question with us is: Is this a valid inspection law of a product of the state of Florida, in the power of the state to enact and enforce without disregard of the Constitution of the United States? The law itself, in its entirety, is written in the margin.[1] It will be seen that, with an important reservation in favor of the producer, it definitely provides for inspection, a standard for such inspection, and officials to make it. The standard itself conforms to that fixed by the United States government. The act forbids the sale in the state, or shipment out of the state, of the uninspected product, with the above referred to proviso that, if the goods are not inspected within 20 days after his demand on the inspector, the producer is given the option to ship his product anywhere without inspection.

The court must presume that the state Legislature in the enactment of this law had a beneficial purpose. This may have been to build up or increase the reputation of the product, that it might also benefit the people of the state, not only the producers, but those at the ports of the state who deal in naval stores. Such purpose cannot be criticised. Was such legislation within the police or inspection power of the state? On this subject, fortunately, there is a great wealth of paramount authority.

Perhaps the latest precedent is Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835. This involved a police statute by which it was made a crime to ship immature citrus fruits from the state. It also was a Florida case. It forbade such shipment under any circumstances. The act was assailed for violation of the national Constitution. The court held:

"We may take judicial notice of the fact that the raising of citrus fruits is one of the great industries of the state of Florida. It was competent for

---

[1] See note at end of case.

the Legislature to find that it was essential for the success of that industry that its reputation be preserved in other states wherein such fruits find their most extensive market. The shipment of fruits, so immature as to be unfit for consumption, and consequently injurious to the health of the purchaser, would not be otherwise than a serious injury to the local trade, and would certainly affect the successful conduct of such business within the state."

Then follows the general proposition:

"The protection of the state's reputation in foreign markets, with the consequent beneficial effect upon a great home industry, may have been within the legislative intent, and it certainly could not be said that this legislation has no reasonable relation to the accomplishment of that purpose."

It would seem that the state has the equivalent right to forbid the injurious sale of adulterated turpentine or inferior rosin. It follows that, to determine the grade and the degree of purity, it may provide for inspection.

In Barbier v. Connolly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923, it was declared by the Supreme Court that the fourteenth amendment and no other amendment was designed to interfere with the power of the state, among other things, "to legislate so as to increase the industries of the state, develop its resources, and add to its wealth and prosperity."

In the case of Turner v. Maryland, 107 U. S. 38, 2 Sup. Ct. 44, 27 L. Ed. 370, it was enacted that:

"After the passage of this act, it shall not be lawful to carry out of this state any hogsheads of tobacco raised in this state, except in hogsheads which shall have been inspected, passed and marked agreeably to the provisions of this act."

It also provided for shipment to a state warehouse in Baltimore. There was a penalty of $300 for the violation. In case, however, the producer packed his tobacco in the neighborhood where grown, and marked his name in full, and his place of residence thereon, and paid the charge of "outage" and storage, he might ship it, although it may not have been sent to the state warehouse for inspection. The legislation, assailed as violative of the Constitution, was pronounced valid. The charge for "outage" was held an inspection charge, and Mr. Justice Blatchford, rendering the opinion for the court, quotes the language of Chief Justice Marshall in the leading case of Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23. There the great Chief Justice, after remarking that power to regulate commerce was not the source from which the right to pass inspection laws was derived, declared:

"The object of inspection laws is to improve the quality of articles produced by the labor of a country, to fit them for exportation, or, it may be, for domestic use. They act upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepare it for that purpose. They form a portion of that immense mass of legislation which embraces everything within the territory of a state, not surrendered to the general government, all of which can be most advantageously exercised by the states themselves."

In Patapsco Guano Co. v. North Carolina Board of Agriculture, 171 U. S. 345, 18 Sup. Ct. 862, 43 L. Ed. 191, the Supreme Court, Mr.

Chief Justice Fuller rendering the opinion, called attention to section 10, art. 1, of the Constitution itself. This reads:

"No state shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws."

Thus the organic law expressly recognizes the inspection power of the state. The Chief Justice also quotes, in that case, the opinion of Mr. Justice Bradley, delivered on circuit, in Neilson v. Garza, 2 Woods, 287, Fed. Cas. No. 10,091, where the latter declared that:

"The right to make inspection laws is not granted to Congress, but is reserved to the states."

This, however, is subject to the paramount right of Congress to regulate commerce with foreign nations and among the states. In the case then before the court, fertilizer and fertilizing material was the subject of inspection. There all of the material was shipped into the state, and the court upheld the inspection law, and declared that the effect on interstate commerce "is indirect and incidental." The opinion ends with the quotation:

"The Constitution of the United States does not secure to any one the privilege of defrauding the public."

In Pittsburgh & Southern Coal Co. v. Louisiana, 156 U. S. 590, 15 Sup. Ct. 459, 39 L. Ed. 544, where coal and coke boat gaugers had been provided by the statute, and it was made compulsory upon persons dealing in these articles in a barge to have the same inspected and gauged, it was held to be not a regulation of commerce, nor, although it related solely to shipments by water, did it discriminate unconstitutionally between the coal of Pennsylvania and the coal of Alabama coming into Louisiana by rail.

In McLean v. Denver & Rio Grande R. R., 203 U. S. 38, 27 Sup. Ct. 1, 51 L. Ed. 78, after announcing the general proposition stated by Chief Justice Marshall, supra, it was held that:

"An act of the territory which made it an offense for a railroad company to receive for shipment beyond the limits of the territory hides which had not been inspected is not unconstitutional, as unwarranted regulation of, or burden on, interstate commerce."

Here the inspection statute of Florida not only (to quote the language of Chief Justice Marshall, supra) "acts upon the subject before it becomes an article of foreign commerce, or of commerce among the states, and prepares it for that purpose" (for all the turpentine and rosin which may be shipped from Florida directly in interstate commerce will not be inspected at all because the inspector fails to appear within 20 days after notice), but the act precludes any one from the privilege of defrauding the public by the adulteration of the product, or by misrepresentation as to its purity and value, and by lawless and ruinous combinations in restraint of the trade, made possible in the past, because the industry had no genuine and effective protection. That this danger threatened is easily demonstrable. It has been encountered elsewhere. It was real, not imaginary. The recorded cases and judgments disclose that the industry demanded the protection of local government. See American Naval Stores Co. Case (C. C.) 172

Fed. 455; Nash v. U. S., 229 U. S. 380, 33 Sup. Ct. 780, 57 L. Ed. 1232.

That the compulsory inspection of naval stores by state officers imposes the burden of inspection charges upon the producers is not at all unreasonable. This, too, was within the power of the Legislature. That power was fully sustained in Lindsay & Phelps Co. v. John H. Mullen and State of Minnesota, 176 U. S. 126, 20 Sup. Ct. 325, 44 L. Ed. 400. There Minnesota had provided that the various surveyors general should have a lien upon logs floated on the rivers and collected in certain chartered booms. There also many of the logs came from other states. A lot of logs were seized for fees aggregating $10,000 or more. There, as here, it was claimed that the statute burdened interstate commerce, and with more reason, because much floatage of logs was from other states. But it was held that the statute of Minnesota, requiring all logs running out of a boom to be surveyed, inspected and scaled, was compulsory, that the legislation was within the power of the state, and also that, where citizens of other states used the booms chartered by Minnesota, their logs were liable for the fees of state officials, inspecting the same. A fortiori must such charges be upheld where the complaint is made by citizens and corporations of the state allowing them.

The same principle was announced in the case of Pabst Brewing Co. v. Crenshaw, 198 U. S. 17, 25 Sup. Ct. 552, 49 L. Ed. 925. There, too, it was held that, even though the law in question might be inadequate to accomplish the purpose designed, it affords for that reason no federal question upon which to hold that the exercise of the police power of the state was unauthorized. This, the court declared, must be measured by the right of the state to control or regulate domestic products.

The complaint that the act unlawfully discriminates and denies equal protection of the laws, in violation of the fourteenth amendment, is equally unfounded. It operates uniformly on all producers of naval stores in the state of Florida. That it may affect producers or dealers in other states does not matter. In the case of Missouri ex rel. Bowman v. Lewis et al., 101 U. S. 22, 25 L. Ed. 989, the Supreme Court declared:

"The fourteenth amendment does not profess to secure to all persons of the United States the benefit of the same laws, and the same remedies. Great diversities in these respects may exist in two states separated only by an imaginary line."

A case illuminative of this question is that of Davis v. State, 68 Ala. 64, 44 Am. Rep. 128.

"It has never been seriously questioned," said that renowned court, "that the jus disponendi is not an absolutely unqualified and indispensable right attaching to property, but is subject to such regulations not inconsistent with the Constitution, as, in the judgment of the law-making powers, the interests of society and good government may require."

In that case the prohibition was against transferring or moving seed cotton between sunset of one day and sunrise of the succeeding day. In the cotton states the significance of this law may possibly be understood.

"Its primary object," said the court, with courteous moderation. "is not to interfere with the right of property, or its vendable character; its object is to regulate traffic in the staple agricultural product of the state, so as to prevent a prevalent evil, which, in the opinion of the law-making power, may have done much to demoralize agricultural labor and destroy the legitimate profits of the agricultural pursuit, to the public detriment, at least within the specified territory. This the Legislature had the power to do."

In Barbier v. Connelly, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923, the court states that while "class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment."

In Soon Hing v. Crowley, 113 U. S. 703, 5 Sup. Ct. 730, 28 L. Ed. 1145, Mr. Justice Field, for the court, observed:

"The discriminations which are open to objection are those where persons engaged in the same business are subject to different restrictions, or are held entitled to different privileges under the same conditions. It is only then that the discrimination can be said to impair the equal rights which all claim in the enforcement of the laws."

In the case before the court, in view of these authorities and many others, it seems indisputable that all persons engaged in the business in Florida have the same rights, privileges, and liabilities, and are subject to such an uniform inspection law, as is a valid exercise of the police power.

Nor has the state of Georgia failed to avail itself of this power. In 27 sections of its Code, from sections 1815 to 1841, inclusive, it has provided an inspection law not less stringent and not less costly than the Florida law before the court. Section 1815 is typical of the others:

"Sec. 1815. *Supervising inspector, appointment, and qualification.* The Governor shall appoint a competent person, who shall be a citizen of the state of Georgia, to be the supervising inspector of naval stores for the state of Georgia, and who shall be skilled in the inspection of and familiar with the grades of naval stores and competent to detect adulteration thereof. No person shall be appointed supervising inspector of naval stores who is a producer, factor, or buyer of or dealer in naval stores, or employed by or connected in business with any such producer, factor, buyer, or dealer in naval stores." Park's Annotated Code of Georgia.

It follows that we must conclude, upon all the grounds assigned in plaintiffs' bill, there is, in this legislation, no violation of the Constitution of the United States, or any provision thereof. For the reasons herein previously stated, we pretermit for the present determination of objections to the effectiveness of the inspection machinery provided by the state statute, the legality of appointment of officials thereunder, and also all objections arising under the Florida Constitution. It does not appear that these have been raised, or at least determined, by the courts of the state. This is simply a motion for preliminary injunction, and our decision here does not finally dispose of the cause. There are no averments which give us primary jurisdiction save those assigning violation of the national Constitution, and these we determine adversely to the plaintiffs. Said Mr. Justice Miller, for the court, in Pelton v. National Bank, 101 U. S. 144, 25 L. Ed. 901:

"It is an appropriate duty, which this court is called upon to perform very often, to protect rights founded on the Constitution, laws, and treaties of the United States, when those rights are invaded by state authority. But it is a very different thing for this court to declare that an act of a state Legislature, passed with the usual forms necessary to its validity, is void because that legislation is violative of the Constitution of the state. It has long been recognized in this court that the highest court of the state is the one to which such question properly belongs; and though the courts of the United States, when exercising a concurrent jurisdiction, must decide it for themselves, if it has not previously been considered by the state court, it would be indelicate to make such a decision in advance of the state courts, unless the case imperatively demanded it."

This case presents no such imperative demand. See Cummings v. National Bank, 101 U. S. 155, 25 L. Ed. 903; Hills v. Exchange Bank, 105 U. S. 319, 26 L. Ed. 1052. The Circuit and District Courts, quite properly, have not departed from this rule.

In Western Union Tel. Co. v. Poe (C. C.) 61 Fed. 469, the court delayed the decision on such a question four months, with the hope that the state Supreme Court might decide it; and in Western Union Tel. Co. v. Poe (C. C.) 64 Fed. 11, the court reversed its own ruling, made, however, before final judgment, when the state Supreme Court had taken a contrary view,

This principle would seem stronger in its application to this court, organized solely to test the validity of such legislation, primarily, at least, in the light afforded by the Constitution of the United States. It would seem, indeed, a grave incursion upon the authority of state legislation and government, should we, when the averment of our primary and constitutional jurisdiction is discredited, then undertake to criticise the efficiency of a state inspection enactment, inquire into the title of its officials under state law, and determine constitutionality in view of the state Constitution, which state courts have not passed upon. We would, in the case before us, thus engender confusion in the orderly development of a mighty and vital resource of the commonwealth, perhaps bring ruin and dismay to those engaged in it, and divert elsewhere the great profits to its people which will doubtless flow from the exploitation of those vast pine forests extending in "boundless contiguity of shade" from the Georgia line to the ultimate point of the Peninsular state.

The application for preliminary injunction is denied, and a decree may be taken accordingly.

NOTE.

Laws of Florida, Chapter 6878—(No. 72).

An act to appoint naval stores inspectors, to prescribe their duties and fix their compensation; to prevent and prohibit adulteration of spirits of turpentine and naval stores, and to provide for the appointment and duties and compensation of a supervising inspector of naval stores, and to prescribe forfeitures and penalties for violating, and methods for the enforcement of the provisions of this act.

Be it enacted by the Legislature of the state of Florida: * * *

Sec. 7. That upon the passage and approval of this act the Governor shall appoint a supervising inspector of naval stores, one or more inspectors of naval stores at large, and shall appoint in each port in this state to which naval stores are or may be consigned for sale or shipment, a sufficient num-

ber of competent inspectors for the business at such port. The supervising inspector, inspector of naval stores at large, and inspectors of naval stores, shall be subject to removal by the Governor at any time for cause; and he shall have power at any time to fill vacancies in said offices. A person in order to be eligible to appointment to any of said offices must be a citizen of the state of Florida, must be skilled in the inspection of and familiar with the grades of naval stores, and competent to detect adulterations thereof. No person shall be appointed an inspector, inspector at large, or supervising inspector of naval stores, who at the time of his appointment is a producer or factor, or buyer of, or dealer in naval stores, or employed by or connected in business with any producer, factor, buyer or dealer; and it shall be unlawful and a cause for removal from office for any inspector, inspector at large, or supervising inspector of naval stores, during his term of office, to become a producer, factor, buyer of, or dealer in naval stores, or to be employed by or connected in business with any such producer, factor, buyer or dealer.

The supervising inspector of naval stores of the state of Florida shall have general supervision and direction of all inspectors of naval stores, including the inspector of naval stores at large, and it shall be his duty to see that they fairly and honestly perform all the duties imposed upon them and in the manner provided by law, and to report to the Governor any delinquencies or irregularity of any such inspector, and shall have power to suspend any inspector for falsely grading or branding turpentine or rosin, and for failure or neglect to perform the duties imposed on him by the provisions of this act, and to investigate complaints made by producers or others, or the conduct of any such inspector in the discharge by him of the duties of his office. The supervising inspector of naval stores shall also have supervision of all naval stores plants, yards, warehouses and other places where naval stores are kept or stored, and it shall be his duty to see that no adulteration of naval stores is permitted in this state, and to collect evidence of any adulteration which may come to his knowledge or be reported to him whenever the same may occur in this state; and to prosecute, or cause to be prosecuted all persons violating the laws of this state in regard to the inspection, marking, branding, or adulteration of naval stores. Said supervising inspector shall also perform such other duties as may be conferred upon him by law, but he shall not perform the duties of an inspector except when necessary to determine the correctness of any inspection made by an inspector. The supervising inspector of naval stores shall visit every yard where naval stores are stored for sale in the state at least six times each year, and shall thoroughly inspect said yards and examine the books and records of the local inspectors.

The inspectors of naval stores shall have power to make inspections of naval stores at the respective ports for which they are appointed, but the inspector of naval stores at large shall have the power to make inspections at any point in the state. The compensation of the inspector of naval stores at large shall be the same for the like service as that hereinafter provided for inspectors of naval stores at ports. The supervisor of naval stores inspectors shall have his office in port of this state receiving the largest amount of naval stores for sale or shipment.  *  *  *

Sec. 10. The supervising inspector of naval stores shall receive as compensation for his services one-half cent for each barrel of rosin or spirits of turpentine which may be inspected under the laws of this state; said fee shall be paid equally by the buyer and seller of such naval stores. In case of naval stores shipped in packages or receptacles other than barrels, his compensation shall be reckoned upon a basis of barrels or fractions thereof in the same manner as is provided for the payment of fees of inspectors under like conditions. The supervising inspector of naval stores shall have the right to recover from any person or corporations liable therefor the fees allowed him under this act in an action of assumpsit, or any other appropriate proceedings in any of the courts of this state having jurisdiction thereof.

Sec. 11. That any person who shall knowingly have in his possession any spirits of turpentine or wood spirits of turpentine for sale, consignment or

shipment which shall be in any manner adulterated without being marked on the outside of the barrel with the words and in the manner required by this act, shall forfeit the same to the state of Florida. Upon sworn information thereof from any person, it shall be the duty of the state attorney for the circuit in which such property subject to forfeiture under this section may be found, to proceed forthwith to have the same forfeited and sold in the following manner: He shall file with the circuit court in the jurisdiction in which said property is found an information in the name of the state of Florida, setting forth the property whereof forfeiture is claimed, the owner thereof, or the person in whose possession the same is found, and the grounds of forfeiture; upon the filing of such information a summons ad respondendum and a writ of attachment, returnable to the rule day not less than ten days from the issuance thereof, shall be thereupon issued without bond or affidavit; such summons and writ of attachment shall be served in the manner provided for services of summons ad respondendum and writs of attachment in civil actions at law, the said writ of attachment shall be levied upon the property which it is sought to forfeit. Thereafter the case shall proceed in the same manner as a civil action at law. In case of attachment, and in the event the property shall be adjudged to be forfeited, the same shall be sold as is provided in the case of sales under execution. Any person claiming to own the property attached, or his agent or attorney, may in such proceeding intervene and defend the said proceeding as in case of attachments. All such proceedings shall be governed in other respects by the rules of pleading and practice applicable to suits at law in cases of attachment. The proceeds arising from said sales shall be paid into the registry of the court, to be paid by the clerk under the order of the court as follows, to wit: One-half to the informant, to be paid upon the certificate of the state attorney that the person claiming the same is entitled thereto as the informer, upon whose information said action was begun, and the remainder to be paid to the county treasurer of the county in which the conviction is had as a part of the fine and forfeiture fund. Neither the supervising inspector nor any other inspector shall be permitted to receive any part of the proceeds of any such forfeiture; and if the information be given by any such inspector, the entire proceeds shall be paid into said fine and forfeiture fund. The penalties, punishments and other provisions of this act, and the enforcement of the same, shall be deemed several, and the enforcement of one shall not preclude or affect the enforcement of any other.

Sec. 12. It shall be the duty of any inspector upon notice given, to attend at such time and place at or near the port for which he is appointed, as he may be required, for the purpose of gauging spirits of turpentine and grading and weighing rosin, and to ascertain the true amount and quality thereof, and to mark the same by branding, or in some other durable manner, on each barrel, receptacle or package, and to issue at once in triplicate, sworn certificates of inspection, the original to be furnished to the producer or shipper; and the triplicates to the buyer or factor and the supervising inspector of naval stores; and the person or persons, firm or corporation, for whom such inspection is made, shall be at liberty to appeal to the supervising inspector to establish the incorrectness of such inspection. If any such article be fraudulently mixed, it shall be condemned by the inspector and sold as provided by section 11 of this act.

It shall be unlawful for any person to pack with rosin any substance other than pine rosin. And it shall be unlawful for any person to knowingly sell or offer for sale, any rosin containing other substance than pure rosin, or to so pack rosin that the package will appear to contain a higher grade of rosin than its true contents. Any one violating the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction, shall be fined not more than $100.00 or imprisoned in the county jail not more than three months.

Sec. 13. It shall be unlawful for a person other than a licensed state inspector to measure and inspect any naval stores in this state. Any person not a licensed inspector in accordance with the provisions of this act, who shall perform the duties of inspector of naval stores, shall be guilty of a misde-

meanor, and upon conviction thereof shall be fined not more than $100.00 or imprisoned in the county jail not more than three months, or be punished by both such fine and imprisonment in the discretion of the court.

Sec. 14. It shall be unlawful for any person to sell in, or ship from this state, any spirits of turpentine or rosin in barrels or bulk of one hundred pounds or more, unless the same shall have been inspected and branded by an inspector duly appointed and qualified under the provisions of this act: Provided, the inspector under the provisions of this act, shall inspect such spirits of turpentine or rosin in barrels or bulk of one hundred pounds or more within twenty days from the date of notice to such inspector of the desire of such person desiring to sell in or ship from this state spirits of turpentine or rosin in barrels or bulk of one hundred pounds or more; such notice to said inspector shall be given by registered mail, and the receipt of such registered mail shall be evidence of the giving of such notice: Provided, further, that no inspection of rosin shall be required at any place other than a port oftener than every twenty days, and any person, firm or corporation who shall violate any of the provisions of this section shall be deemed guilty of a, misdemeanor, and upon conviction shall be punished by a fine of not more than $500.00, or by imprisonment in the county jail for not more than three months, or by both such fine and imprisonment, at the discretion of the court: Provided, however that nothing herein shall be deemed to make it unlawful for a producer to make a shipment or shipments of uninspected spirits of turpentine or rosin from the place of production to a port or ports in this state for which inspectors have been appointed.

Sec. 15. The inspection, grading and branding, or marking of the quality of rosin and turpentine as aforesaid, shall be according to the standard rosin and turpentine types and such types shall conform as nearly as possible to New York standard rosin and turpentine types; but in the event the Department of Agriculture of the United States shall hereafter establish rosin and turpentine types, then the inspection, grading and branding, or marking of the quality of rosin and turpentine, under this act, shall be according to such rosin and turpentine types so established by said Department of Agriculture of the United States.

Sec. 16. An inspector of naval stores shall receive for his services in inspecting rosin including weighing, inspection and cooperage, six cents per barrel, and for inspecting turpentine, including gauging, inspection, bunging and cooperage nine cents per barrel, and no more, to be paid by the owner or party for whom the inspection is made. When any such rosin or turpentine shall be in any receptacle or package other than a barrel, the inspector for inspecting the same shall receive for his services per barrel or fraction thereof of the contents of such receptacle or package, the same fee or amount of compensation hereinbefore allowed for inspecting each barrel. An inspector shall not be obliged to inspect any article or quantity until the fee thereof shall have first been paid. * * *

Sec. 20. That every person who produces, manufactures, consigns, sells, or keeps for sale, and every manufacturer, producer of, or dealer or factor in naval stores in the state of Florida shall post and keep posted a written or printed copy of this act in a public place at the still location, warehouse, yards, or other place where he shall manufacture, store or keep naval stores, and it shall be the duty of the secretary of the state to cause a sufficient number of copies of this act to be printed for public distribution, and for the purposes aforesaid. Any person who shall violate any of the provisions of this section shall be guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not more than $300.00, or by imprisonment in the county jail for not more than six months, or by both such fine and imprisonment in the discretion of the court.

Sec. 21. This act shall take effect upon its passage and approval by the Governor or upon becoming a law without his approval.

Approved June 5, 1915.